IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Priscilla Sowell, | ) | |
| | ) | C/A No.: 0:04-1620-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION AND** |
| | ) | **O R D E R** |
| Springs Industries, Inc. Long Term | ) | |
| Disability Plan, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Priscilla Sowell brought this action on May 21, 2005, alleging wrongful denial of benefits by Defendant Springs Industries, Inc. Long Term Disability Plan ("the Plan") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. On July 23, 2004, the court issued a specialized case management order. Pursuant to paragraph four of the scheduling order, the parties were to file cross-motions for judgment and a joint stipulation as to the facts and administrative record to be considered by the court. The parties filed a joint stipulation on March 23, 2005. Defendant filed its motion for judgment on April 11, 2005. Plaintiff filed its motion for judgment on April 12, 2005. The court heard oral arguments on the motions on September 15, 2005. On October 11, 2005, Defendant submitted additional affidavits in support of its motion for judgment from Dr. James Wallquist, Dr. Tamara Bowman, Dr. Wendy Weinstein, and Dr. Russell Superfine. On October 13, 2005, Defendant filed a supplement to its memorandum in support of judgment along with the affidavit of Dr. Neil Schechter. On January 6, 2006, Plaintiff submitted a supplement to its memorandum in support of judgment advising the court of new and relevant legal authority.

1

The court has thoroughly reviewed the pleadings, motion, memoranda, exhibits, and depositions submitted by the parties in support of their respective positions.  The court concludes that Plaintiff's motion for judgment should be granted, Defendant's motion denied, and benefits reinstated.

<u>Findings of Fact</u>

1.  Plaintiff was employed by Springs Industries, Inc. ("Springs Industries") as a receptionist/secretary until she ceased working on June 1, 1998.  Plaintiff's Memorandum in Support of Judgment, p. 2.  Plaintiff ceased working due to medical conditions including "rotator cuff syndrome, impingement of shoulder, neck, back and hip pain, and angina and high blood pressure."  <u>Id.</u>

2.  The Plan is administered by Defendant.  As Plaintiff conceded during the September 15, 2005 hearing, Defendant is self-funded and independent from Springs Industries.  An employee covered by the Plan is entitled to long-term benefits if she is "totally disabled."

3.  Article IV of the Plan defines the conditions under which a participant is declared "totally disabled" and, therefore, is entitled to benefits.  Administrative Record, pp. 473-520.   The Plan provides

**Article IV**
**Eligibility for and Payment of Long Term Disability Benefits**

4.1   **General**

Each Participant who (i) becomes Totally Disabled as defined in Section 4.2, and (ii) has been Totally Disabled continuously during the Waiting Period specified in Section 4.3, shall be entitled to be a monthly disability benefit as provided in Sections 4.4, 4.5, 4.6, and Article V.

2

4.2    **Totally Disabled or Total Disability**

    (a)    The term Totally Disabled or Total Disability means,

        (1)    during the first twenty-four (24) months of absence from work, the inability due to a physical or mental condition of the Participant to perform the duties of his regular occupation while under the direct care of a Physician during such absence; and

        (2)    after the first twenty-four (24) months of absence from work, the complete inability due to a physical or mental condition of a Participant to engage in any occupation for which the Participant is reasonably qualified on the basis of training, education or experience taking into account only such occupations that (i) are within fifty miles of such Participant's home and (ii) have job earnings that are equal to or greater than seventy percent of the Participant's pre-disability Salary from the Company or an Affiliate. However, for the purposes of the preceding sentence, whether the Participant would actually be hired for such occupation or whether a vacancy exists for such occupation shall not be taken into account.

    (b)    Under this plan, the date on which Total Disability is incurred shall mean the first on which the Participant is absent from employment due to the Total Disability.

4.3    **Waiting Period**

The Waiting Period shall be ninety days of continuous Total Disability except as provided in Section 4.5(b).

4.4    **Payments**

Subject to the provisions of section 4.5 and 4.6, Long Term Disability payments shall commence after completion of the Waiting Period, payable once each month, in accordance with nondiscriminatory procedures established by the Plan Adminstrator. Payments shall be made to the Pariticpant only during the period of Total Disability. If Total Disability occurs prior to the Pariticpnant's attainment of age 60, payments shall continue until the earliest of (i) the end of the month in which such Participant attains age 65; (ii) the date such participant successfully completes the Rehabilitation Services Program and who compensation pursuant to such Rehabiliation Services Program equals or exceeds the Long Term Disability benefit under the Plan; or (iii) the date the Participant no longer meets the requirements for Long Term Disability benefits under the Plan. If Total Disability occurs on or after the Participant's attainment of age 60, payments shall continue to the end of the 60th month following

3

the month in which Total Disability was incurred, provided such Participant continues to meet the requirements from Long Term Disability benefits under the Plan.

**4.5    Exclusions**

(a)    No Long Term Disability benefits shall be payable to a Participant:

(1)    during the Waiting Period, except as provided in (b) below;
(2)    if the Participant fails to provide conclusive medical evidence of Total Disability. . . .

**4.6    Cessation of Benefits**

Long Term Disability payments to a Participant shall cease upon the earliest of the following dates:

(a)    the date the Participant is no longer Totally Disabled;
(b)    the date the Participant is not under the continuous care of a Physician who is practicing within the scope of such Physician's license and is prescribing a defined course of treatment appropriate to such Participant's disability. . .

**4.7    Medical Examination**

A recipient of Long Term Disability benefits shall be required to submit evidence of continued Total Disability satisfactory to the Plan Administrator or the Claims Administrator at least annually. In addition, a recipient of Long Term Disability benefits may be required to undergo medical examinations by a Physician selected by the Plan Administrator or the Claims Administrator and to submit other evidence of continued Total Disability satisfactory to the Plan Administrator or Claims Administrator at any time to determine such recipient's continued entitlement to disability benefits. If it is determined by the Plan Administrator or the Claims Administrator that the recipient is no longer Totally Disabled or if the recipient refuses to submit to medical examinations or to submit evidence of Total Disability as required by the Plan Administrator or Claims Administrator, such recipient's disability benefits under this Plan shall cease as of the date of such determination or refusal.

Id. at 496- 500. Plaintiff, as an employee of Springs Industries and a participant in the Plan, was subject to the above-enumerated conditions of the Plan.

4

4.    Plaintiff's effective date of total disability was June 1, 1998, which was the date that she was first absent from work due to illness or injury.  Id. at 1.  Plaintiff's claim was covered by Section 4.2(a)(1) for twenty-four months from her first day of absence from work.  Id.  As such, Plaintiff was entitled from June 1, 1998 to May 30, 2000, to benefits under the Plan, if she was unable "due to a physical or mental condition . . . to perform the duties of [her] regular occupation while under the direct care of a Physician during such absence. . . ."  Id.; see id. at 496.

5.    Effective June 1, 2000, Plaintiff was entitled to benefits under the Plan if she was unable "due to a physical or mental condition . . . to engage in any occupation for which [she was] reasonably qualified on the basis of training, education or experience taking into account only such occupations that (i) are within fifty miles of [her] home and (ii) have job earnings that are equal to or greater than seventy percent of [her] pre-disability Salary from the Company or an Affiliate."  Id.

6.    The Plan gave the review committee discretionary authority to review claims.  In relevant part, Section 8.2(b) of the Plan provides that "[t]he Plan Committee shall have the power to determine, in its sole and absolute discretion, all questions arising in connection with the administration, interpretation, and application of the Plan, to the extent that such determinations are not specifically delegated to another person or persons."  Id. at 504.

7.    Plaintiff received monthly disability benefits effective August 28, 1998.  Id. at 1.  Defendant denied continuation of Plaintiff's benefits on September 1, 2003, because Plaintiff allegedly failed to provide "objective medical evidence from a medical provider that demonstrates that

she was disabled from 'any occupation' from September 1, 2003 through present." <u>Id.</u> at 3.

8.  Plaintiff submitted to Defendant on March 27, 2003 a statement from Dr. Roy Still, her treating physician, regarding her disability. <u>Id.</u> at 62-65. In that statement, Dr. Still noted that Plaintiff suffered from "right shoulder rotator cuff syndrome, bursitis, status post rotator cuff repair, cervical pain." Dr. Still concluded, based on an assessment of his objective findings and Plaintiff's subjective symptoms, that Plaintiff had a "class 5" physical impairment and, therefore, was not able to complete sedentary work. <u>Id.</u> at 63. Dr. Still also stated that Plaintiff "could not work period." <u>Id.</u> at 64.

9.  Kemper Services ("Kemper") is the claims administrator for the Plan. <u>Id.</u> at 109. On June 9, 2003, Kemper retained Dr. Russell Superfine, a specialist in internal medicine, to review all of the documentation in Plaintiff's claim file to determine whether Plaintiff was entitled to continued benefits under the Plan. <u>Id.</u> at 91-92. In his report, Dr. Superfine challenged Dr. Still's conclusions and concluded that there were insufficient "physical and diagnostic findings to support a functional impairment which would preclude [Plaintiff] from performing the duties of any occupation." <u>Id.</u> at 92.

10. On July 8, 2003, Plaintiff, at Kemper's request, completed a Functional Capacity Evaluation ("FCE"). <u>Id.</u> According to the FCE, Plaintiff was unable to climb ladders or reach overhead. <u>Id.</u> Plaintiff was able to lift up to 10 pounds frequently and could occasionally lift up to 20 pounds. <u>Id.</u> The FCE also noted that Plaintiff takes "hazzard, cardizem, bacloten, lodin, zoloft, lipitor, and tricore." <u>Id.</u> at 95. The FCE did not discuss how these medications affect Plaintiff's capacity to work.

6

11.    On August 5, 2003, Plaintiff, at Kemper's request, completed a Labor Market Survey.  Id. at 101-108.  The Labor Market Survey relied on the FCE's conclusion that Plaintiff was able to engage in work with a physical demand of  "Sedentary to Light capacity."  Id. at 102.  According to the Labor Market Survey, Plaintiff was "employable in many occupations that exist within the Lancaster, SC area."  Id. at 103.  The Labor Market Survey recommended that Plaintiff seek employment as a receptionist, customer service representative, or dispatcher, and provided Plaintiff with contact information for current job openings at various local companies. Id. at 104-107.

12.    Upon review of Sowell's medical records and the FCE, Kemper concluded that the medical documentation "does not support your disability status as defined by our LTD plan."  Id. at 109.  Kemper claims that it did not base its conclusion on the medical review of its retained expert, Dr. Superfine.  Id.  On July 15, 2003, Kemper requested that Plaintiff supplement her file with additional documentation to support her disability status but claims that Plaintiff did not provide this information.  Id. at 110.  Kemper informed Plaintiff that her benefits would be terminated effective September 1, 2003, and advised Plaintiff of her rights to appeal.  Id.

13.    On September 22, 2003, Dr. Still, Plaintiff's treating physician, wrote a letter to Kemper requesting that Plaintiff's file be reconsidered.  Id. at 112.  Dr. Still stated

> [a]lthough evaluations through other methods have stated she could likely return to a light sedentary job, it is my medical opinion that she would be unable to do this on a regular basis eight hours a day for a regular work week.  She would require frequent breaks, she would be markedly limited in what range of motion and activities she could do and would not be a desirable employee because of the likelihood of frequent absences from work because of pain.

7

Id.  On October 3, 2003, Plaintiff's counsel sent an appeal letter to Kemper on Plaintiff's behalf.  Id. at 113-114.  On October 8, 2003, Kemper sent a letter to Plaintiff's counsel acknowledging receipt of the appeal letter and requesting that Plaintiff supplement her file with additional information to support her claim of disability.  Id. at 115.  Plaintiff's counsel sent various additional medical documents dating from 1999 through 2004, including Plaintiff's affidavit.  Id. at 118-357.[1]  Included in this report was an affidavit from Dr. Still.[2]

---

[1]   For her illnesses, Plaintiff takes numerous prescription drugs, including Diltiazem, Ultracet, Premarin, Tricor, Zoloft, Etodolac, Zyrtec, and Lipitor.  In her affidavit, Plaintiff stated that she suffers side effects from her medications, including excessive weight gain, fatigue, tiredness, and lack of energy.  Id. at 122-123.  Plaintiff also stated

> As a result of my problems I suffers [sic] pain and discomfort and I am extremely limited in what I can do with my upper extremities and when I am experiencing severe pain or discomfort I am often incapacitated.  I also suffer from severe and profound fatigue as a result of my angina and high blood pressure.  I cannot perform any sort of task for any extended period of time without having to stop and rest for an equal amount of time or longer.  It is difficult for me to lift any sort of weight with my shoulders.  I cannot lift my arm above shoulder level without experiencing severe pain and discomfort in my shoulder.  When I get up in the morning I begin to deal with my pain and when I go to bed in the evening I am still dealing with it.  I deal with the pain and discomfort all day, every day.  By the afternoon I am so exhausted that I am forced to take a nap for several hours to cope with the pain and discomfort.  It is my hope that one day I will receive relief from the problems which I suffer, but right now dealing with my problems is a full-time endeavor, in and of itself, and I cannot imagine that I could work at any job.  Additionally, the foregoing description describes me on a good day.  On a bad days [sic] I may be "laid up" for the whole day and the bad days occur quite frequently.

Id.

[2]   Dr. Still stated that "the subjective problems of which [Plaintiff] complains are completely consistent with her objectively diagnosed medical problems and the known side effects of her prescription medications."  Id. at 130.  Dr. Still also provided a list of common symptoms of Plaintiff's prescriptions.  Id. at 130-133.

8

14.    During the appeal, Kemper retained Dr. Wendy Weinstein, a specialist in internal medicine, and Dr. Neil Schechter, a specialist in orthopedic surgery, to conduct peer reviews on Plaintiff's claim.  Id. at 358-361.  Both physicians concluded that the information provided did not support a functional impairment that would preclude Plaintiff from working in "any occupation."  Id.  Neither opinion discussed how Plaintiff's medications affect her capacity to work.

15.    On January 5, 2004, Kemper, now known as Broadspire Services, Inc. ("Broadspire"), upheld the denial of Plaintiff's claim.  Broadspire concluded that "[a]though the medical evidence submitted indicates that [Plaintiff] suffers from pain, there is a lack of medical evidence to support a functional impairment that would preclude her from performing the functions of any occupation."  Id. at 369.  On January 8, 2004, Plaintiff's counsel sent a notice of appeal to Broadspire.  Id. at 371.

16.    After receipt of the appeal, Broadspire retained Dr. Tamara Bowman, a specialist in internal medicine and endocrinology, and Dr. James Wallquist, a specialist in orthopedic surgery. Id. at 374-383.  Both physicians concluded that the information provided did not support a functional impairment that would preclude Plaintiff from working in "any occupation."  Id. In particular, Dr. Wallquist noted that "the preponderance of the medical documentation provided, fails to support total disability from any occupation due to lack of updated quantitative physical findings and diagnostics to correlate with the claimant's chronic subjective complaints."  Id. at 383.  Neither opinion discussed how Plaintiff's medications affect her capacity to work.

9

17.    Based upon its review of the record, the Springs Disability Appeals Committee reviewed Plaintiff's claim and determined that Plaintiff had "not provided objective medical evidence that demonstrates that she is 'Totally Disabled' as defined under Sections 4.2, 4.6 of the Plan." Id. at 1.  In particular, the Springs Disability Appeals Committee noted that "[t]he claim file indicates that [Plaintiff] takes a number of medications that have side effects, but the claim file does not indicate that [Plaintiff] is actually experiencing any or all of those side effects, such that the side effects from the medications themselves would preclude [Plaintiff] from light sedentary work under the Plan definition of 'any occupation.'" Id. at 3. Broadspire, after consulting with its claims auditor after the peer reviews were completed, asserts that in conducting the peer review, that all of the medical information, including data regarding medications and side effects experienced by Plaintiff, was taken into consideration. Id. at 8.

18.    Based upon the second denial of her claim, Plaintiff brought this action pursuant to Section 502(a) of ERISA.

## Conclusions of Law

1.    There exists a "well-settled framework" for reviewing an administrator's or fiduciary's denial of benefits under an ERISA plan. Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997).  Initially, the court must determine whether the ERISA plan confers discretionary authority upon the administrator or fiduciary. Id at 233; Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996).  If the plan confers discretion, the court must decide whether the administrator or fiduciary acted within the scope of that discretion. Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989).  Where the administrator or fiduciary acts under contractually-conferred discretion, the court must accord deference to the decision and review the determination only for an abuse of discretion.  Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996); Doe v. Group Hospitalization and Medical Svcs., 3 F.3d 80, 85 (4th Cir. 1993).  Under this deferential standard of review, the court will not disturb a reasonable decision by an administrator or fiduciary, even if, independently, the court would have reached a different conclusion. Ellis, 126 F.3d at 232.

2.     However, a plan's language must expressly create discretionary authority.  Feder v. Paul Revere Life Ins. Co., 228 F.3d 513, 522 (4th Cir. 2000).  The terms of a plan must indicate a clear intention to delegate final authority to determine eligibility to the plan administrator. Id. at 523.  If a plan does not clearly grant discretion, the standard of review is *de novo*.  Id. at 524.  Of course, because *de novo* review is more rigorous, if a reviewing court upholds a benefits decision under *de novo* review, it also would uphold it under a deferential standard. Id. at 522.  Any ambiguity in an ERISA plan "is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured."  Bynum v. Cigna Healthcare, Inc., 287 F.3d 305, 313-14 (4th Cir. 2002).

3.     The court concludes, and the parties concede, that the Plan's wording confers discretionary authority on Defendant.  Accordingly, the proper standard of review of Defendant's denial of Plaintiff's claim for benefits is abuse of discretion.

4.     Plaintiff contends that Defendant abused its discretion in denying Plaintiff's claim for continued disability benefits because Defendant "failed to consider an important aspect of the Plaintiff's medical condition and problems."  Memorandum in Support of Judgment, p.

18.  It is well-settled that a plan administrator must consider a claimant's file in its entirety and cannot simply rely on "bits of evidence out of context" to reach its conclusion.  <u>Myers v. Hercules, Inc.</u>, 253 F.3d 761, 767 (4th Cir. 2001).  Failure to consider an important aspect of a claimant's medical condition may be considered an abuse of discretion.  <u>Id.</u>  In particular, Plaintiff believes that Defendant should have considered the side effects Plaintiff has experienced with her prescription medications in making its final determination.  <u>Id.</u> at 22.  Defendant contends that "[t]he Committee specifically took into consideration the side effects of the medications [Plaintiff] is taking."

5.    In its final denial letter to Plaintiff, Defendant stated that "[t]he claim file indicates that [Plaintiff] takes a number of medications that have side effects, but the claim file does not indicate that [Plaintiff] is actually experiencing any or all of these effects. . . ."  Administrative Record, p. 3.  Defendant also relied on an opinion from a claims auditor at Broadspire, which assured Defendant that "[t]he peer review takes into account all of the available medical information, which would include data regarding her medications and any side effects she may be experiencing."  <u>Id.</u> at 8.

6.    Defendant's reliance on the claims auditor's assurance that all of the relevant peer reviews considered the side effects of Plaintiff's medications was unreasonable.  Plaintiff had subjective complaints of excessive weight gain, fatigue, tiredness, and lack of energy.  <u>Id.</u> at 130.  Dr. Still, Plaintiff's treating physician, opined that Plaintiff's regimen of medications (Diltiazem, Ultracet, Premarin, Tricor, Zoloft, Etodolac, Zyrtec, and Lipitor) along with her objectively diagnosed medical problems, were completely consistent with Plaintiff's subjective complaints.  <u>Id.</u>  Although the claims auditor asserts that Defendant's retained

12

experts considered the effect of Plaintiff's medications on her ability to work, the proffered expert reports do not support that assertion. Defendant's experts failed to give adequate consideration to the impact that Plaintiff's medications might have on her capacity to work. In so doing, Defendant abused its discretion as plan administrator.  For the foregoing reasons, it is ORDERED that Plaintiff's motion for judgment is **granted**.  Defendant's motion for judgment is **denied**.  Plaintiff's benefits are reinstated.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
United States District Court Judge

March 10, 2006
Columbia, South Carolina